**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

JAMES ELLIS, III, *et al.*, *on behalf of*
*themselves and all similarly situated*
*individuals*,

       Plaintiffs,

v.                              Civil Action No. 3:13-cv-473

SWIFT TRANSPORTATION CO.
OF ARIZONA, LLC,

          Defendant.

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL
OF CLASS ACTION SETTLEMENT AND AN AWARD OF ATTORNEY'S FEES AND
<u>SERVICE PAYMENTS</u>**

The Named Plaintiffs, on behalf of themselves and the Class, respectfully submit this memorandum in support of final approval of the class settlement reached in this case. Class Counsel also petitions the Court for an award of attorney's fees and costs incurred to litigate this matter to the successful result now before this Court for final approval.

## I.      OVERVIEW

This class settlement is made on behalf of truck drivers nationwide who applied for employment with Swift Transportation Co. of Arizona, LLC ("Swift") by remote means[1] and whose consumer reports were obtained by Swift to determine employability. After contentious litigation that spanned four years and two district court dockets, and included hundreds of thousands of documents and electronic records, five law firms for two parties, and substantial third party discovery, a settlement was reached and preliminarily approved by the Court. Class Counsel now moves the Court to order final approval of the $5.053 million cash settlement.[2] In addition, Class Counsel requests a contingency fee award of thirty percent (30%) of the common fund.

The original Complaint filed on July 23, 2013, and the Amended Complaint filed February 14, 2014 each alleged that Swift failed to comply with the Fair Credit Reporting Act's (FCRA) disclosure and authorization requirements as a precondition to obtaining consumer reports for employment purposes.  (Doc. 1, Doc. 25); 15 U.S.C. 1681b(b)(2)(B). Further, the Named Plaintiffs alleged that Swift failed to provide additional disclosures when denying

---

[1] Remote applicants are those who applied with Swift by mail, telephone, computer or other similar means as described in 15 U.S.C. § 1681b(b)(2)(C) and 15 U.S.C. § 1681b(b)(3)(C).

[2] The total Settlement Fund increased from $4,400,000.00 to $5,053,500.00 based on an ultimately larger class size than the Parties originally estimated.  Class counsel negotiated the additional fund amount. Under the terms of the Settlement Agreement, Swift was obligated to contribute additional funds, or Plaintiffs could terminate the settlement. (Doc. 36-1, ¶ 9.3)   At the demand of the Plaintiffs, Swift contributed the additional $653,000 required by the enlarged class size, further enhancing the relief obtained for the class.

employment based upon the results of the reports.  (Doc. 1, Doc. 25). 15 U.S.C. 1681b(b)(3)(B). Defendant has denied all of Plaintiffs' claims and further denies any wrongdoing and liability to Plaintiffs or any putative class members in any amount.

Prior to the instant action, present Class Counsel engaged in a connected precursor FCRA class action against Swift filed in the District of Arizona captioned *Daniel, et al. v. Swift Transportation Corporation,* 2:11-cv-01548-PHX-ROS ("*Daniel*").  *Daniel* involved the same class claims involving the procurement and use of consumer report for employment purposes. The Parties engaged in significant pre-trial discovery and litigation, including the review of hundreds of thousands of pages of documents, contentious depositions and full briefing on summary judgment and class certification.[3] After the dismissal of the *Daniels* matter, Plaintiffs filed and prosecuted this continuation class case.[4]

In the midst of discovery in this matter, having previously litigated identical issues among the same counsel in *Daniel*, the Parties agreed to mediate the *Ellis* claims.  In February 2014, the Parties retained John Bickerman to facilitate a private mediation in Washington, D.C. that involved arm's-length, contentious, lengthy, and complicated negotiations (with the participation of Swift's insurance carriers).  Ultimately, an agreement was reached that provides significant monetary relief to a total of 180,998 Class Members.  ("Settlement Agreement", Doc. 36-1). The present settlement is one that has been the subject of Class Counsel's efforts since early 2011.  Indeed, the negotiation process has continued since and even through the day of this filing as the parties attempted – successfully - to deal with the stipulation issue raised by the single Objector team and to broker peace on this point.

---

[3] The case was ultimately dismissed on procedural grounds.  *Daniel*, 2:11-cv-01548-PHX-ROS (Feb. 11, 2013) (Doc. 117).

[4] This action was treated as such a continuation in multiple ways, including by the negotiation of a protective order to carry the previous documents and discovery production into this action.

Despite denying any wrongdoing, the Defendant has consented to the Plaintiff's request to enter an order of Final Approval of the Class Action Settlement and authorize distribution of settlement proceeds to the Class.  Swift denies liability in this case and vigorously contested both the Plaintiffs' factual allegations and statements of law. The settlement agreement itself specifically articulates Swift's denial. (Doc. 36-1 at 3–4).   But the Plaintiffs' challenge was greater than merely proving that Defendant violated the law.   Instead, Plaintiff alleged a "willful" violation of the FCRA.  15 U.S.C. § 1681n.  Swift argued that even if its understanding of the law was incorrect, it was not unreasonable—and not willful.   And in fact, Swift was successful during the initial earlier battle, prevailing in the attempt to certify this class and obtain this relief in the *Daniels* docket.

As noted above, Class Counsel has fervently litigated this matter since 2011.   Taken together, these efforts present this settlement after depositions of numerous Swift management employees and significant formal discovery on nearly all issues, including the production of hundreds of thousands of documents. Counsel then engaged in substantial discovery negotiations through an extensive meet-and-confer process that resulted in supplemental productions.

On February 26, 2014, the parties finally held an in-person mediation before mediator John G. Bickerman, and (very) late in that evening, they reached a preliminary settlement, which was later reduced to a full blown agreement requiring the continued negotiation of a myriad of terms and wordsmithing issues.   This proposed class action settlement (Doc. 36-1), which provides for a $4.4 million cash settlement, was later amended to $5.053 million. Additional terms such as the amount of the service awards, attorney's fees and costs were only negotiated after the class claims had been settled and relief secured for the class members. And as part of

3

that settlement, Class Counsel negotiated the narrowest release possible. As explained below, this settlement is an excellent result for the Class. It provides a meaningful monetary payment to each class member without the risks of further and extended litigation. It includes significant cash payments to class members akin to similar FCRA-statutory recovery class outcomes. And the settlement has not engendered a single substantive objection.

Out of 152,375 class members that received notice, 56 have opted-out of the settlement—a .03675% opt-out rate.[5] (Affidavit of Risa Neiman, ¶¶ 3–7, attached as Exhibit "1").

Accordingly, the parties now ask the Court to order final approval of the Settlement and Plaintiffs ask the Court to award attorney's fees and costs to class counsel.

## II. THE SETTLEMENT, NOTICE, AND CLAIMS PROCESS

### A. Settlement Terms

#### 1. The Class

The court preliminarily approved the following settlement class definition:

> All consumers residing in the United States who applied for employment in a Department of Transportation regulated position with Swift via facsimile, telephone, an internet website, electronic mail, regular mail, or through a third party from July 23, 2008 through September 30, 2012, and as to whom Swift procured a criminal background, motor vehicle history report, or Consumer Report, which report was obtained by Swift before there had been at least one in-person interaction with the consumer.

The Settlement Class is divided into two groups:

> "Group I Class Members" means the members of the Settlement Class who applied for a Department of Transportation regulated position with Swift between July 23, 2011 and September 30, 2012.

> "Group Two Class Members" means the members of the Settlement Class who applied for a Department of Transportation regulated position with

---

[5] In calculating the opt-out rate, Class Counsel assumed that all class members who were mailed a notice were successfully found and notified unless their notice was returned as undeliverable, thus yielding a .03675% opt-out rate. (Ex.1, Neiman Aff. ¶¶ 3–7). The rate of opt-outs to the entire class size is just .0003074%.

Swift between July 23, 2008 and July 22, 2011.

There are 54,898 Group One Class Members. There are 126,100 Group Two Class Members. The distinction between the Group One and Group Two Class Members was drawn principally to address the large size of the class and the relevant statute of limitations, and it requires input from them as to when and if they may have "discovered" the violation. See 15 U.S.C. § 1681p. This section provides:

> An action to enforce any liability created under this subchapter may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction, not later than the earlier of—
>
> (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or
> (2) 5 years after the date on which the violation that is the basis for such liability occurs.

The Parties disputed the application of the statute of limitations to the 3-5 Year Class, particularly whether § 1681p barred claims arising more than two years after Swift obtained a consumer report. In an effort to compromise, the Parties agreed to apply a claims process to the 3-5 Year Class, which would include a simple verification that the Class member was unaware of his FCRA claim before July 23, 2011.

### 2.    *Consideration provided to the settlement classes under the settlement agreement*

If the settlement is approved, Swift will pay $5,053,500.00 into a Settlement Fund to pay Class Members, the cost of notice and administration, attorney fees and costs, and service awards. Group One Class Members will automatically receive a $50.00 check. Uncashed checks from this initial distribution will be combined with remaining Settlement Funds, and distributed to Group Two Class Members in a pro rata amount not to exceed $50.00 after deductions for administration costs, approved attorney's fees and service awards.

The Settlement Agreement permits Class Counsel to seek an attorney fee and reimbursement of costs up to 30% of the Settlement Fund. Additionally, Named Plaintiffs may each seek a service awards up to $5,000.00.

### 3. The narrow release

Class Counsel negotiated the narrowest release possible under the circumstances. Rule 23(b)(3) class members, each of whom will receive a cash payment, will release Defendant and related persons from all claims resulting from, arising out of, or in any way connected to Swift obtaining or using a criminal background, motor vehicle history, DAC report, or other Consumer Report information related to or regarding a consumer. The Rule 23(b)(3) Settlement Class has agreed to this release in exchange for the cash payments that its class members will receive under the Settlement Agreement, which are intended to compensate them for any possible harm that they might have alleged in this case had it proceeded to trial.

### 4. Class notice

The notice program described in the Settlement Agreement and approved in the Preliminary Approval Order was designed to reach as many Class Members as possible using First-Class-U.S. mail. Both the Defendant, as well as a third-party consumer-reporting agency, HireRight Solutions, Inc., provided the names and addresses for the notices. The Class Administrator reports raw numbers demonstrating an 83.67% effective delivery rate, which is an acceptable, and even exceptional, rate. *See In re Serzone*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*, 3:05cv00143 (E.D. Va. Aug. 29, 2006) (Final Order approving class notice with approximately 85% delivery rate).

### B. The notice process is complete.

In accordance with the Preliminary Approval Order, Class Counsel retained McGladrey,

LLP, a national class administration company, to accomplish the settlement's notice and claims process. The class notice was certainly the best available given the factors of this case. While it is almost always difficult to obtain current addresses and identification information on class members, especially when a consumer may be facing difficulty finding employment, the parties and McGladrey were able to minimize this problem in this case. Class Counsel directly supervised all of McGladrey's actions, and there were many communications, decisions and consultations required between the administrator and class counsel throughout the notice process.  Additionally, Class Counsel and Defendant's counsel have consulted and worked together throughout the notice and claims process to reach consensus on its day-to-day implementation.

On July 18, 2014, McGladrey initially sent 180,998 Notices by First Class U.S. Mail. (Ex.1, Neiman Aff. ¶¶ 3–5). Of the mailed notices, 29,005 were undeliverable. (Ex.1, Neiman Aff.  ¶¶  6 – 7 ). 382 notices were returned with a forwarding address. *Id.* These notices were remailed to the updated addresses. *Id.* 28,623 notices were returned with no forwarding addresses. *Id.*

In addition to the mailed notices, the McGladrey also established a website, http://swiftclassaction.com, on July 18, 2014, so that consumers and anyone else could access all the information in the notice, as well as the Settlement Agreement, Preliminary Approval Order, and Class Counsel's and McGladrey's contact information. (Ex.1, Neiman Aff. ¶¶ 8–9). The Supreme Court has concluded that notice sent by first class mail to each class member satisfies the requirements of due process. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812–13 (1985).

McGladrey's website:   (1) enabled Class Members to access and download the Class Notice; (2) enabled Class Members to download an exclusion form, (3) provided a list of

critical dates and deadlines in the settlement process; and (4) provided relevant updates and information with respect to the settlement and approval process. As of September 26, 2014, McGladrey received 67 email inquiries and 15 pieces of correspondence, including name and address updates, as well as notifications regarding deceased Class Members. (Ex.1, Neiman Aff. ¶¶ 12–13). In addition to the website, McGladrey also established a dedicated, toll-free number on July 18, 2013. As of September 12, 2014, the dedicated phone line received 2,474 calls. (Ex.1, Neiman Aff. ¶ 11).

At an 83.67% "locate" and delivery percentage, the notice process was a success. (Declaration of Leonard A. Bennett, attached as Exhibit "2").

### C.      Settlement results

The minimum net payment to be made to class members is in cash, unconditional and meaningful. Consumers give up few of their rights, releasing only the narrowest of claims, and obtain a cash benefit without otherwise having to commence any litigation of their own (indeed, the period of limitations for most claims would have long ago expired, or the class member would have at least had to overcome the Defendant's statute of limitation defense).

The settlement is structured so that only Group Two Class members were required to submit a claim form.  Group One Class Members will automatically receive a check for $50.00. If Plaintiffs' petition for attorney's fees and costs is granted, the net payment to each Group Two Class Member will be approximately $29.64, slightly more than half of the $50.00 amount that Group One class members with claims in the 0-2 year time period will receive—a fair result.

### D.      Class member reaction

Unquestionably, the settlement is an excellent result for the class. Indeed, the lack of any

substantive objection[6] and opt outs (56 exclusion requests) speaks volumes.  The collective voice of the Class is overwhelmingly positive. By any account, this settlement is a resounding success for the class members.

The raw numbers of opt-out requests are indeed minimal, but nonetheless are worthy of consideration. Given the size of the class and their experience in previous cases, Class Counsel expected a number of objections directing animus towards Swift, class actions generally, and/or the counsel that bring them, but none were made here.  And certainly it is unusual that even professional objectors or so-called "greenmailers" [7] could not find a basis to challenge the settlement. The single objection that was made is now resolved, with a stipulation resolving it to be submitted to chambers shortly.

## III.   ARGUMENT

### A.   The proposed settlement is fair, reasonable, and adequate and should be approved.

#### 1.   The standard for judicial approval of class action settlements

This Court's judicial policy strongly favors resolution of litigation prior to trial. *See, e.g.*, *S.C. Nat'l Bank v. Stone*, 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("[t]he voluntary resolution of litigation through settlement is strongly favored by the courts") (citing *Williams v.  First Nat'l Bank, 216* U.S.  582  (1910)).  Settlement spares the litigants the uncertainty, delay and expense of a trial and appeals while simultaneously reducing the burden on judicial resources. As the

---

[6] Even the non-substantive objection—seeking confirmation on the record of the limited release—has been resolved.

[7] "'[P]rofessional objectors' almost invariably groundless objections delay the provision of relief to class members who, in most instances, have already waited years for resolution. Second, by feeding off the fees earned by class counsel who took the risk of suing defendants on a purely contingent basis, as is the normal practice in class actions, professional objectors create a disincentive for class counsel to take on such risky matters. That disincentive clashes with the public interest, repeatedly recognized by courts, to incentivize class counsel to handle such cases." Bruce D. Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to*

court in *S.C. Nat'l Bank* observed:

> In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation imposes upon already scarce judicial resources.

749 F. Supp. at 1423 (quoting *Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305, 313 (7th Cir. 1980) *overruled by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998)); *see also* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

But to safeguard the interests of the absent class members, all class settlements and the later dismissal of the case requires Court approval. Fed. R. Civ. P. 23(e)(1)(A). The process for that approval is governed by Rule 23(e), which provides in relevant part:

> (e) Settlement, Voluntary Dismissal, or Compromise.
>
> (1)(A) The court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class.
>
> (B) The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise.
>
> (C) The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.
>
> (2) The parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) must file a statement identifying any agreement made in connection with the proposed settlement, voluntary dismissal, or compromise.

Rule 23(e) thus imposes two basic requirements on the parties and the Court before the approval and dismissal of a class settlement. First, the Court must determine that notice was directed "in a reasonable manner to all class members." Fed R. Civ. P. 23(e)(1)(B). Second, the Court must determine that the settlement "is fair, reasonable, and adequate." The parties address

---

*Class Action Settlements*, 84 St. John's L. Rev. 949, 951 (2010).

each of these requirements in turn.

Federal jurisprudence strongly favors resolution of class actions through settlement. *San Francisco NAACP v. San Francisco Unified Sch. Dist.,* 59 F. Supp. 2d 1021, 1029 (N.D. Cal. 1999); *see* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy."). Rule 23 requires Court review of the resolution of a class action such as this one. Specifically, the Rule provides that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Court approval is required to ensure that the parties gave adequate consideration to the rights of absent class members during settlement negotiations. *Henley v. FMC Corp.,* 207 F. Supp. 2d 489, 492 (S.D. W. Va. 2002) (*citing In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 158 (4th Cir. 1991)). The Court may approve a settlement only after a hearing and on finding that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approval of a class action settlement is committed to the "sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case   basis, in light of the relevant circumstances." *In re MicroStrategy, Inc. Sec. Litig.,* 148 F. Supp. 2d 654, 663 (E.D. Va. 2001). Additionally, "there is a strong initial presumption that the compromise is fair and reasonable." *Id.* (quoting *S. Carolina Nat'l Bank*, 139 F.R.D. at 339).

In determining whether a given settlement is reasonable, the court should avoid transforming the hearing on the settlement into a trial on the merits regarding the strengths and weaknesses of each side of the case. *Flinn v. F.M.C. Corp*, 528 F.2d 1169, 1172–73 (4th Cir. 1975). Ultimately, the approval of a proposed settlement agreement is in the sound discretion of the Court.  *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va.

11

1995) (citing *Jiffy Lube*, 927 F.2d at 158).

### 2.    *The notice to the Class Members was reasonable.*

In a settlement class maintained under Rule 23(b)(3), the class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e).  Federal Rule 23(c)(2) requires that notice to the class must be "the best practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c). The Rule also requires that the notice inform potential class members that (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out; (3) and any member who does not opt out may appear through counsel. *Id.* The Court must consider the mode of dissemination and the content of the notice to assess whether such notice was sufficient. *See* Federal Judicial Center, Manual for Complex Litigation § 21.312 (2004).

Here, the class list was compiled using data received from HireRight, Swift's consumer reporting vendor during the applicable period, and the entity that actually sold the reports to Swift. From this data, the Administrator was able to identify 54,898 potential class members for the 0-2 Year Class and 126,100 potential class members for the 3-5 Year Class. (Ex.1, Neiman Aff. ¶ 2).  Thereafter, the Administrator mailed notices to the class members via first class postage as required by the Settlement Agreement. *Id.*  After the initial mailing, 8,459 notices to the 0-2 Year Class and 20,164 notices to the 3-5 Year Class were returned as undeliverable with no forwarding address. No additional action was taken on these undeliverable notices.  *Id.*  An additional 382 total notices were returned undeliverable with forwarding addresses, which were remailed. *Id.*

In addition to the robust mailing process, the Administrator established a website (http://www.swiftclassaction.com) to provide immediate access to all court documents, notices,

and an online claims process.  Further, a toll free telephone number was established to permit class members the opportunity to speak with a live settlement representative to answer their questions and to field their requests for additional copies of settlement documents.  Telephone representatives received over 2,400 phone calls, including over 240 requests for a copy of the Notices.  *Id.*

With a nearly 84% delivery rate, it appears that there is truly no better alternative that could have been attempted. As this Court held, "[w]hat amounts to reasonable efforts under the circumstances is for the Court to determine after examining the available information and possible identification methods . . . 'In every case, reasonableness is a function of [the] anticipated results, costs, and amount involved.'" *Fisher v. Va. Elec. & Power Co.*, 217 F.R.D. 201, 227 (E.D. Va. 2003) (citations omitted). The Supreme Court has also concluded that direct notice satisfies due process, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812–13 (1985), and other courts—including this court and others within the Fourth Circuit—have approved mailed-notice programs reaching a similar percentage of the class. *See In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 236 (S.D. W. Va. 2005)(approving notice program where direct mail portion was estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*, 3:05cv00143 (E.D. Va. Aug. 29, 2006) (final order approving class notice with approximately 85% delivery).

Swift also served notice of this settlement upon the state attorneys general and federal authorities as required by the Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. § 1715. None of these agencies or states has objected to the Settlement.

The parties' efforts to provide class members with notice of the settlement makes in clear that such notice was the best available notice under the circumstances given: (a) the available

information; (b) the possible identification methods; (c) the number of class members; and (d) the amount of the settlement. The parties have complied fully with the Court's Preliminary Approval Order, and have taken reasonable steps to ensure that the Class Members were notified—in the best and most direct manner possible—of the Settlement's terms and excellent benefits.

### 3. An analysis of the Jiffy Lube factors demonstrates that the settlement is fair and reasonable.

The Court must proceed to judge the fairness, reasonableness and adequacy of the settlement using what is often called the *Jiffy Lube* test. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158.

The *Jiffy Lube* analysis first requires a determination as to the settlement's fairness. The fairness factors are critical to the protection of the class members from unscrupulous class counsel and focus on the arm's-length nature of negotiations. *See In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383 (D. Md. 1983); *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991). Four sub-factors are used to evaluate fairness: (i) the posture of the case at the time of settlement; (ii) the extent of discovery that has been conducted; (iii) the circumstances surrounding the negotiations; and (iv) the experience of counsel. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158-59; *see also In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 663-64; *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995).

A proposed class action settlement is considered presumptively fair where there is no evidence of collusion and the parties, through capable counsel, have engaged in arm's-length negotiations. *See S.C. Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991). *See also In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 662 (S.D. Fla. 2011) (the court approved the settlement which was absent of collusion, was the product of informed, good-faith, arms'-length

negotiations between the parties and their capable and experienced counsel, and was reached with the assistance of a well-qualified and experienced mediator).

Here, the Parties agreed to settle only after conducting sufficient merits-related discovery, both formally and informally, much of which was adduced during the *Daniel* litigation. The fact that the parties had fully litigated *Daniel*—inclusive of taking in-depth depositions and reviewing hundreds of thousands of documents, reproduced again for use in this case—provided counsel with a deep and granular understanding of Swift's policies and procedures as well as the strengths and weaknesses of the case. The Parties also conducted extensive and substantive settlement discussions leading up to and throughout a full day of mediation facilitated by a private neutral mediator.

The posture of the case at the time of settlement is also a factor that supports approval. *See In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 664 (approving of proposed settlement despite the fact that it was reached "early" in litigation). While Plaintiffs were prepared to seek class certification, Swift was prepared to not only oppose certification, but also seek summary judgment. And while Class Counsel disagreed with the merits of Swift's defensive theories, the opportunity to obtain such a favorable result for the Class through settlement could not be overlooked.

There are undeniable advantages to the parties and to the docket when opposing counsel are already up to speed on the legal and factual issues in a case and in a field of practice. *See S.C. Nat'l Bank*, 139 F.R.D. at 339 (concluding fairness met where settlement discussions "were, at times, supervised by a magistrate judge and were hard fought and always adversarial," and those negotiations "were conducted by able counsel" with substantial experience in the area of law).[8]

---

[8] *See discussion infra; see also* Ex. 2.B.

15

The Parties also engaged in discovery sufficient to aid counsel and the Court in evaluating the claims and defenses. These facts further point demonstrate that the settlement was the product of arm's-length negotiations by experienced counsel, and thus warrants final approval. *See In re Jiffy Lube*, 927 F.2d at 159; *see also Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 501-02 (E.D. Va. 1995)(concluding fairness requirement met where "plaintiffs' counsel, with their wealth of experience and knowledge in the securities-class action area, engaged in sufficiently extended and detailed settlement negotiations to secure a favorable settlement for the Class").

### 4. *An analysis of the Jiffy Lube factors demonstrates that the settlement is adequate.*

The Court must also determine whether the proposed class settlement is substantively "adequate." Pursuant to the Fourth Circuit's guidance in *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, the adequacy inquiry is guided by evaluating: (1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159.

Plaintiffs have at all times believed that this is a strong case supported by documentary evidence and deposition testimony. Swift likewise presented a confident defense, contesting certification and defending the adequacy of its FCRA compliance. Importantly, Plaintiffs' claims were premised on the theory that Swift willfully violated the FCRA. *See* 15 U.S.C. § 1681n. Only in the case of willful noncompliance, may a consumer may recover statutory and punitive damages. Without the certainty afforded both sides in the approval of the class settlement, all

parties would have proceeded with a long, expensive litigation process, likely culminating in a trial on the merits, followed by a likely appeal. In short—even in the best-case scenario and in the Rocket Docket, relief was still years away.

The determination of when it is appropriate to settle a case is one that is entrusted to experienced class counsel. Settlement is the only means by which the parties can control the outcome of the litigation, alleviating both the risk and cost inherent in further litigation. This case was no exception, and in fair consideration of the strengths and weaknesses (as well as with significant involvement by the mediator), Class Counsel felt that settlement was appropriate at this juncture. The old adage, "a bird in hand is worth two in the bush" applies with particular force in this case. *See Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.*, 85 CIV. 3048 (JMW), 1987 WL 7030, at *2 (S.D.N.Y. Feb. 13, 1987) (concluding that because continued prosecution of the action would have been expensive and time-consuming, and would have involved substantial risks, it [was] not unreasonable for the plaintiff class to take a 'bird in the hand'"); *Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 547 (D. Colo. 1989) (noting that [i]t has been held prudent to take a bird in the hand instead of a prospective flock in the bush'" in weighing the value of an immediate recovery against the mere possibility of future relief after protracted and expensive litigation") (quoting *State of W. Va. v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 740 (S.D.N.Y. 1970) *aff'd,* 440 F.2d 1079 (2d Cir. 1971)); *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 667. Given the risks to both sides, and the possibility that the Plaintiffs may not prevail at trial, the *Jiffy Lube* factors militate in favor of the adequacy of the settlement.

### 5.     *The settlement is reasonable.*

By its terms, the settlement provides substantial monetary consideration to the Class. Additionally—while not conceding liability—Swift changed its procedures and processes that

were at the heart of this case.

It is noteworthy that despite mailing 180,998 total notices, no class members have objected to the monetary components of the settlement. "Such a lack of opposition to the partial settlement strongly supports a finding of adequacy, for '[t]he attitude of the members of the Class, as expressed directly or by failure to object, after notice to the settlement is a proper consideration for the trial court.' *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)." *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 668. As the Court has previously explained, "[b]ecause 'the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.' The lack here of any objections to the partial settlement and the small number of class members choosing to opt-out of the case strongly compel a finding of adequacy" *Id.* (citing *Sala v. Nat'l R.R. Passenger Corp.*, 721 F. Supp. 80, 83 (E.D. Pa. 1989). "The small number of objections necessarily must be evaluated relative to the size of this Class of over 1.0 million members. In litigation involving a large class it would be "extremely unusual" not to encounter objections. *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 478-79 (S.D.N.Y. 1998) (internal citations omitted). Courts recognize that where the class as a whole supports a settlement, it should be approved.[9]   Indeed, even a small majority of support creates a presumption in favor of approval. *See Reed v. Gen. Motors Corp.*, 703 F.2d 170, 174 (5th Cir. 1983)(approving class action settlement where more than 40 percent of class objected or opted out); *Cotton v. Hinton*, 559 F.2d 1326, 1333 (5th Cir. 1977) (nearly 50 percent

---

[9] *See, e.g., In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 180 (5th Cir. 1979); *Laskey v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW)*, 638 F.2d 954 (6th Cir. 1981)(small number of objectors demonstrates fairness of a settlement); *Shlensky v. Dorsey*, 574 F.2d 131 (3d Cir. 1978)(same); *Bryan v. Pittsburgh Plate Glass Co. (PPG Indus.)*, 494 F.2d 799, 803 (3d Cir. 1974); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 (2d Cir. 1987) (thirty-six percent; settlement approved); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (sixteen percent; settlement approved).

opted out or objected; settlement nevertheless approved).

**B.** **The Court should approve the request for service payment, attorney's fees, and reimbursement of expenses.**

      *1.*     *The Court should award service payments to the Class Representatives.*

The Court should approve service awards for the named Plaintiffs. Named Plaintiff Ellis requests a service award of $5,000.00 and the remaining Named Plaintiffs each request an award of $1,000.00, all of which are to be deducted from the settlement fund, for their service as named class representatives. In this case, the Named Plaintiffs took an active role in the case, participated in the crafting of the pleadings, and were responsive to Class Counsel throughout the litigation. Such awards have been regularly approved in this district. *See, e.g.*, *Beverly v. Wal-Mart Stores, Inc.*, No. 3:07cv469; *Williams v. Lexis Nexis Risk Mgmt.*, No. 3:06cv241; *Cappetta v. GC Servs. LP*, No. 3:08cv288-JRS (E.D. Va. April 27, 2011); *Makson v. Portfolio Recovery Assoc., Inc.*, No. 3:07cv982-HEH (E.D. Va. Feb. 9, 2009); *Daily v. NCO,* No. 3:09CV31-JAG*; Conley v. First Tennessee,* No. 1:10CV1247-TSE*; Lengrand v. Wellpoint,* No. 3:11Cv333-HEH. Particularly in light of historical service awards both within and outside this District, the requested service awards are appropriate. *See, e.g.*, *Staton v. Boeing Co.*, 327 F.3d 938, 976–77 (9th Cir. 2003); *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998). "An empirical study published in 2006 suggests that incentive awards are granted in only about a quarter of class suits (28%) and that the average award per class representative is about $16,000, with the median award per class representative being closer to $4,000." 4 Newberg on Class Actions § 11:38. The awards sought here are well within the average range and appropriate for this matter. Indeed, the Class Notice advised that up to $5,000.00 would be requested for each Named Plaintiff, and no Class Member objected to this amount.

19

### 2.      *Class Counsel is experienced and competent.*

Class Counsel specializes in FCRA and class action litigation. When they negotiated the settlement in this case, they made it their first priority to achieve the best possible outcome for the Class. (*See* Ex. 2, Bennett Decl.; Declaration of Anthony Pecora, attached as Exhibit "3".). This Court has recognized the advantages that experienced counsel with an expertise in both the factual and legal issues in a case present to both the parties and to the docket. *See S.C. Nat'l Bank*, 139 F.R.D. at 339 (concluding fairness met where settlement discussions "were, at times, supervised by a magistrate judge and were hard fought and always adversarial," and those negotiations "were conducted by able counsel" with substantial experience in the area of securities law).

Leonard Bennett, Matthew Erausquin, Susan Rotkis, and Casey Nash of Consumer Litigation Associates, P.C., have extensive collective experience in both consumer protection and class action litigation, having been involved in now numerous, large consumer class actions where they have been found to be suitable Class Counsel. *See, e.g., Soutter v. Equifax Info. Servs., LLC,* 3:10CV107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) ("[T]he Court finds that Soutter's counsel is qualified, experienced, and able to conduct this litigation. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases."); *See also Williams v. Lexis-Nexis Risk Mgt.*, No. 3:06CV241 (E.D. Va. 2008); *Beverly v. Wal-Mart*, No. 3:07Cv469 (E.D. Va. 2007); *Capetta v. GC Servs., Inc.,* No. 3:02cv288 (E.D. Va.); *Ryals v. HireRight Sols. Inc.,* No. 3:09CV625 (E.D. Va.), *Daily v. NCO,* No. 3:09CV031 (E.D. Va. 2011); *Conley v. First Tennessee,* No. 1:10CV1247-TSE (E.D. Va.)*; Lengrand v. Wellpoint,* No. 3:11CV333-HEH (E.D. Va.); *Henderson v. Verifications Inc.,* No. 3:11CV514-REP (E.D. Va. 2013); *Pitt v. K-Mart Corp*, 3:11CV697; *White v. Experian,* 8:05-cv-01070; *Teagle v. LexisNexis Screening*

*Solutions, Inc.* (formerly "Choicepoint"); *Berry v. LexisNexis Risk & Information Analytical Group*, 3:11cv754 (E.D. Va.).

Matthew A. Dooley, and Anthony R. Pecora also have extensive experience in consumer protection and class action litigation, particularly representing truck drivers and others in the transportation industry. *See, e.g.*, *White v. CRST, Inc.*, Case No. 1:11-cv-2615 (N.D. Ohio); *Hall v. Vitran Express, Inc.*, Case No. 1:09-cv-00800 (N.D. Ohio); *Smith v. New England Motor Freight, Inc.,* Case No. 2:12-CV-03559 (D.N.J.); *Avery v. Boyd Bros. Transportation*, Case No. 4:13-CV-00579 (W.D. Mo.); *Demmings v. Clean Harbor*, Case No. 2:14-CV-01017 (W.D. Wash.); *Avery v. Werner,* Case No. 4:14-CV00330 (W.D. Mo.); *Scott v. KKW Trucking*, Case No. 3:14-CV00494 (D. Or.); *Johnson v. Midwest Logistics Systems*, Case No. 2:11-cv-1061 (S.D. Ohio); *Bell, et al v. US Xpress*, Case No. 1:11-cv-00181 (E.D. Tenn.).

### 3. *An award of attorney's fees is proper where Class Counsel has obtained a substantial recovery for the class.*

#### a. *The requested attorney's fee of 30 percent of the common fund is proper.*

The Supreme Court has consistently calculated attorney's fees in common-fund cases on a percentage-of-the-fund basis. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165–67 (1939); *Boeing Co. v. van Gemert*, 444 U.S. 472, 478–79 (1980); *Blum v. Stenson*, 465 U.S. 886, 900 n. 16 (1984); *see also* Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 242 (Oct. 8, 1985) (noting that fee awards in common funds cases have historically been computed based on a percentage of the fund). The Supreme Court has never adopted the lodestar method over the percentage-of-recovery method in a common-fund case, even when lower federal courts began using the lodestar approach in the 1970's. *See Shaw v. Toshiba Am. Info. Sys., Inc.* 91 F. Supp. 2d 942, 943 (E.D. Tex. 2000); *see also Manual for Complex Litigation* § 24.121 at 210.

21

Since *Blum*, virtually every Circuit Court of Appeals has joined the Supreme Court in affirmatively endorsing the percentage-of-recovery method as an appropriate method for determining an amount of attorney's fees in common-fund cases. *See In re GMC*, 55 F.3d 768, 821–22 (3d Cir. 1995); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047–50 (9th Cir. 2002); *In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515–16 (6th Cir. 1993); *Camden I. Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *Swedish Hosp. Corp v. Shalala*, 1 F.3d 1261, 1268–70 (D.C. Cir. 1993); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2d Cir. 2000).

In the Fourth Circuit, attorney's fees in common-fund cases, such as this one, are almost universally awarded on a percentage-of-the-recovery basis. *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05cv00187, 2007 WL 119157, at *1 (M.D.N.C. Jan 10, 2007); *see DeLoach v. Philip Morris Cos.*, No. 00-1235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003) (citing, with approval for this same proposition, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D. Me. 2003)); *see also Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 502 (E.D. Va. 1995) (explaining "[a]lthough the Fourth Circuit has not yet ruled on this issue, the current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases.").

The Fourth Circuit has not established a benchmark for fee awards in common-fund cases, but district courts within the Fourth Circuit have noted that most fee awards range from 25 percent to 40 percent of the settlement fund. Percentage-fee awards are exactly what the name suggests—class counsel's fees are determined as a percentage of the total settlement fund. This Court has recognized the importance of incentivizing experienced class counsel to take on risky

cases. *See, e.g., In re Microstrategy, Inc. Sec. Litig.*, 172 F. Supp. 2d at 788. In fact, a comprehensive study of attorney's fees in class action cases notes "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. of Empirical Legal Studies 27, 31, 33 (2004). This holds true even in instances where the class recovery runs into the hundreds of millions of dollars. *See, e.g., In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d at 295 (approving award of thirty percent of $220 million); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (awarding thirty-six percent of $125 million); *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) (approving award of 36% of $3.5 million settlement fund); *Gwozdzinnsky v. Sandler Assoc.*, No. 97-7314, 1998 WL 50368, 159 F.3d 1346 (2d Cir. 1998) (table) (affirming district court's award of 25% of $1 million common fund) (unpublished); *In re Educ. Testing Serv.*, 447 F. Supp. 2d 612, 631 (E.D. La. 2006) (concluding the customary fee award for class actions "is between 22% and 27%"); *In re CMS Energy ERISA Litig.*, No. 02-72834, 2006 WL 2109499, at *1 (E.D. Mich. June 27, 2006) (awarding fee of 28.5% of $28 million settlement fund); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995 (D. Minn. 2005) (awarding 25% of $80 million settlement fund); *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003) (granting attorneys fees in amount of 33.3% of $1.5 million settlement fund); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (awarding 33.3% of $3.8 million settlement fund); *Kidrick v. ABC Television & Appliance Rental*, No. 3:97cv69, 1999 WL 1027050, at *1–2 (N.D. W. Va. May 12, 1999) (awarding 30.6% of approximately $400,000 settlement fund, noting, "[a]n award of fees in the range of 30% of the fund has been held to be reasonable. . . . Fees as high as 50% of the fund have been awarded.") (internal

citations omitted).

In this case, the Defendant does not oppose Class Counsel's fee request. And not one of over 150,000 class members has objected to the requested fee award.  As with any of their class cases, Class Counsel lives by the result that they obtain for the class members.  In this case, where Class Counsel bore the risk of the litigation entirely and advanced significant funds in furtherance of the litigation, Class Counsel submits that a fee of 30% of the common fund is reasonable. Class Counsel has consistently argued that attorney's fees in class cases should be calculated under the percentage-of-recovery method, even in cases where it results in objectively small fee awards. For example, in *Mayfield v. Memberstrust Credit Union*, 3:07cv506 (E.D. Va. Nov. 7, 2008), Class Counsel's fee award was only $8,300—well below Class Counsel's actual time in the case—due to the case's small class size. Additionally, in *Conley v. First Tennessee*, 1:10cv1247 (E.D. Va.), counsel took the same consistent position with respect to a 350-member class, resulting in a fee award of only $20,000.00. (Docket No. 37).  The same was true in *Lengrand v. Wellpoint*, No. 3:11Cv333-HEH (Docket No. 42), in which counsel requested a percentage-of-fund recovery even though the class size discovered was very small and the fee requested, $8,550.00, was a small fraction of the large fee counsel actually incurred. In every class case, Rule 23 demands that Class Counsel represent the class's interest—regardless of whether the class size is in the hundreds of thousands, such as *Ryals v. HireRight Solutions*, or is less than a hundred, as in *Lengrand v. Wellpoint*.

These matters, and others that were dismissed or resolved individually, are the necessary context for this case and what may seem, in raw dollars, to be a large fee.  In this litigation, as in all class cases, Class Counsel's fate is tied to the class. Class Counsel's fee request is substantial for a single reason: both the class and the common fund—not the potential recovery, or the non-

monetary or the abstract value, the actual cash benefit is the class—are substantial. The cash that

the Defendant must pay is for the benefit of the class. This symmetry of services between Class

Counsel and the Class motivates Class Counsel to maximize class's cash benefit to the largest

degree possible.   If a common-fund fee was capped at a dollar value rather than a market

percentage, there would still be an incentive to take such cases, but there would also be a

disincentive to achieve anything other than a low common-fund amount. The relationship should

stay symmetrical.  As one district court pointedly reasoned:

> Simply put, the class action vehicle is broken. While it may not instantaneously or
> completely resolve the problems that currently arise in this type of litigation, tying
> the award of attorneys' fees to claims made by class members is one step that
> judges can take toward repair. This approach will not only encourage more
> realistic settlement negotiations and agreements, but also will drive class counsel
> to devise ways to improve how class action suits and settlements operate. *See*
> Deborah R. Hensler and Thomas D. Rowe, Jr., *Beyond "It Just Ain't Worth It":*
> *Alternative Strategies for Damage Class Action Reform,* 64 Law & Contemp.
> Probs. 137, 150 (2001) (" 'The single most important action that judges can take
> to support the public goals of class action litigation is to reward class action
> attorneys only for lawsuits that actually accomplish something of value to class
> members and society.' **To this end, ... analysts recommend[ ] that judges**
> **award fees based on the actual amounts paid out by defendants to class**
> **members, notwithstanding contrary case law." (quoting Deborah Hensler et**
> **al., Rand, Class Action Dilemmas: Pursuing Public Goals for Private Gain-**
> **Executive Summary 33 (1999))). Class counsel will have an incentive to pay**
> **attention to the needs and desires of the class and to "think outside the box"**
> **to devise better notice programs, settlement terms, and claim procedures, all**
> **to the benefit of the consumers who have been harmed.**

*In re TJX Cos. Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 406 (D. Mass. 2008) (emphasis

added).

In this case, Class Counsel shouldered the entire risk of the litigation, appropriately

staffed it with experienced counsel, spent significant time investigating the case prior to filing,

conducted the back and forth of discovery, vigorously litigated, and finally negotiated for a

significant period of time, effectively concluding on the date of this filing, to reach this result for

the Class.  Doing so required zealously litigating a complex federal case while at the same time

attempting to identify the terms where the parties might find compromise.  While the fee will be substantial—certainly so—it is well deserved and earned.  Class Counsel's risks should be compensated as law allows. Class Counsel requests a fee based on their earned percentage of the cash fund obtained.  They do not seek a credit for any "practice changes" or any benefit that the class members will receive when they interact with the Defendant in the future, despite that class counsel in other matters are able to make an effective argument that such non-monetary relief has value, such that it would increase the denominator in the "fees to value" ratio, and thus reduce the fee percentage that they are asking for.  Yet, there is no doubt that the excellent outcome in this case for the Class was the result of risk-taking, persistence in the face of setback, and genuinely hard work expended by a group of skilled lawyers on both sides.[10]

In this case, and in all cases in which Plaintiffs' counsel will come before this Court, they submit that the proper measure of compensation should be driven by the benefit actually obtained for the class members. Because Class Counsel's requested fee of 30% is reasonable under the circumstances of this case and the applicable law, the Court should award it.

> b.    *A crosscheck of time incurred by attorneys and paralegals*
>        *provides support for the requested fee.*

A crosscheck is not required to determine the fairness of a fee when the percentage of recovery method is used.   However, this court and others have sometimes requested that attorneys estimate the number of hours spent in the litigation and a statement of the hourly rates for all attorneys and paralegals involved as a cross-check in determining the percentage of the common fund that should be awarded.  *Manual for Complex Litigation (Fourth)* § 21.724.

---

[10] Class Counsel has included a month-by-month, attorney-by-attorney summary of work performed.  (Ex. 2.A).  They have not attempted to compile all of their time and expenses, nor have they attempted to edit their summaries for billing discretion, replication or record-keeping errors.  The records are offered for the single purpose of evidencing the length and complexity of the litigation.

The focus of a fee determination is the benefit for the class. *Id*. § 21.71 ("compensating counsel for the actual benefits conferred on the class members is the basis for awarding attorney fees. The 'fundamental focus is the result actually achieved for class members.' That approach is premised on finding a tangible benefit actually obtained by the class members. In comparing the fees sought by the lawyers to the benefits conferred on the class, the court's task is easiest when class members are all provided cash benefits that are distributed."). In this case, each member of the (very large) class will receive a cash benefit. Plaintiff has demonstrated that 30% of the cash fund is appropriate based on the outcome of the case for the benefit of the class, the range that has been found to be appropriate in this court. Indeed, "empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in the class actions average around one-third of the recovery." 4 Newberg on Class Actions § 14:6 (4th ed.); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (review of 289 class action settlements demonstrates "average attorney's fees percentage [of] 31.31%" with a median value that "turns out to be one-third."). In an analysis of such historic patterns, Silber and Goodrich explained that empirical evidence doesn't necessarily establish what a court should do in any given case, but it does provide guidance to the court in determining whether a fee is reasonable. Reagan W. Silber & Frank E. Goodrick, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response,* 17 Rev. Litig. 525, 545–46 (1998).

When the court also looks at the attorneys and the hours they and their law firms expend on a given case, it may give additional support to an award of a fee. In this case, counsel has provided the following estimate of their billable time, not including expenses.

| Law Firm | Attorney Hours |
|---|---|
| Consumer Litigation Associates, P.C. | 1,249.45 |
| O'Toole McLaughlin Dooley & Pecora | 1,017.68 |

All of the attorneys and law firms entered into this case without an expectation to make a Lodestar application.  The time actually expended in this case for important tasks such as answering class member questions and significant time spent strategizing among counsel has never been recorded.  Not all e-mail, telephone calls, or simpler work has been included.  No paralegal time has been included.[11]

The requested fee is $1,516,050.00.  The total estimated fee for all attorneys and paralegals in this case is $851,506.  Therefore, in order to reach the requested fee, the gross multiplier would be 1.74.

These multipliers are within the range of fairness.  Courts nationwide have—many times over—approved multipliers larger than the one Class Counsel requests here, sometimes in cases in which much less work was completed.  *See, e.g., In re Charger Commc'n, Inc., Sec. Litig. No. MDL 1506*, 4:02CV1186CAS, 2005 WL 4045741, at *1, *18 (E.D. Mo. June 20, 2005) (approving lodestar multiplier of 5.61); *In re Excel Energy, Inc., Sec., Derivative & ERISA Litig.,* 364 F. Supp. 2d 980, 989 (D. Minn. 2005) (approving a multiplier of 4.7 in a case that only involved document review, and was resolved without any depositions after two days of mediation); *In re Rite Aid Corp. Sec. Litig.,* 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (awarding lodestar multiplier of 6.96 despite the fact that the parties engaged mostly in informal discovery and took no depositions); *Maley v. Del Global Techs. Corp*., 186 F. Supp. 2d 358, 362 (S.D.N.Y 2002) (describing multiplier of 4.65 as "modest" in a case in which plaintiffs conducted no depositions, only interviews, and confirmatory discovery consisted of tens of thousands of pages of documents;); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y.

---

[11] The attorney's rates range between $165.00 per hour to $575.00. In its fee estimate, Class Counsel has erred on the conservative side for CLA in assigning a blended rate of $400.00 per hour, compared to the billable rates in Ex. 2.A.

1998) (awarding 3.97 multiplier, reasoning that multipliers between 3 and 4.5 were common); *DiGiacomo v. Plains All Am. Pipeline*, Nos. Civ. H-994137, Civ. H-99-4212, 2001 WL 34633373, at *3, *11 (S.D. Tex. Dec. 19, 2001) (endorsing multiplier of 5.3 despite the fact no depositions were taken and most of the discovery was informal or document review); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (affirming multiplier of 3.65 to compensate class counsel for risk of taking the case); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197–98 (S.D.N.Y. 1997) (approving multiplier of 5.5 in what the court described as risky and hard fought litigation); *In re Interpublic Sec. Litig,* 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) (awarding multiplier of 3.96): *In re WorldCom, Inc., Sec. Litig.*, 388 F. Supp. 2d 319, 353 (S.D.N.Y. 2005)(awarding multiplier of 4).

It is also proper to include costs of $30,575.70 that were incurred in this matter. (Ex. 2.A).

## IV.     CONCLUSION

Based upon the foregoing, the parties respectfully request that the Court enter an order finally approving the Settlement Agreement, awarding the requested service awards, and awarding attorney fees and costs to Class Counsel in the amount of $1,516,050.00.

Respectfully submitted,
**PLAINTIFFS,**
*on behalf of themselves and all similarly situated individuals*


_____/s/_____
Matthew J. Erausquin, VSB No. 65434
Casey S. Nash, VSB No. 84261
Consumer Litigation Associates, P.C.
1800 Diagonal Rd., Ste. 600
Alexandria, VA 22314
Tel: (703) 273-7770
Fax: (888) 892-3512
matt@clalegal.com
casey@clalegal.com

29

Leonard A. Bennett, VSB No. 37523
Susan M. Rotkis, VSB No. 40693
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
757-930-3660
757-930-3662 (fax)
lenbennett@clalegal.com
srotkis@clalegal.com

Matthew A. Dooley, *Admitted Pro Hac Vice*
Anthony R. Pecora, *Admitted Pro Hac Vice*
O'Toole Mclaughlin Dooley & Pecora Co LPA
5455 Detroit Road
Sheffield Village, Ohio 44054
Tel: (440) 930-4001
Fax: (440) 934-7208
mdooley@omdplaw.com
apecora@omdplaw.com

*Counsel for the Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on this 29th day of September 2014, I have filed the foregoing with the court using the CM/ECF system, which will send a NEF to counsel of record in this case:

Charles K. Seyfarth, Va. Bar No. 44530
Meagan A. Mihalko, Va. Bar No. 80703
LECLAIR RYAN
Riverfront Plaza, East Tower
951 East Byrd Street, Eighth Floor
Richmond, Virginia 23219
Direct:          804.916.7159
Fax:             804.916.7259
charles.seyfarth@leclairryan.com
meagan.mihalko@leclairryan.com

Brian J. Foster, Admitted Pro Hac Vice
John F. Lomax, Jr., Admitted Pro Hac Vice
SNELL & WILMER L.L.P.
One Arizona Center
400 East Van Buren
Phoenix, Arizona 85004
Direct:          602.382.6242
Fax:             602.382.6070
bfoster@swlaw.com
jlomax@swlaw.com

*Counsel for the Defendant*

_____/s/_____
Matthew J. Erausquin, VSB No. 65434
*Counsel for the Plaintiff*
CONSUMER LITIGATION ASSOCIATES, P.C.
1800 Diagonal Rd., Ste. 600
Alexandria, VA 22314
Tel: (703) 273-7770
Fax: (888) 892-3512
matt@clalegal.com
